**STATE of Missouri ex rel. ASSOCIATED NATURAL GAS COMPANY,**
**Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF THE STATE OF MISSOURI,**
**Respondent.**

**No. WD 52973.**

Missouri Court of Appeals,
Western District.

Sept. 23, 1997.

Rehearing Denied Nov. 25, 1997.

Gary W. Duffy, Jefferson City, for Appellant.

Thomas R. Schwarz, Jr., Jefferson City, for Respondent.

Before LOWENSTEIN, P.J., and SPINDEN and HOWARD, JJ.

HOWARD, Judge.

Associated Natural Gas Company (ANG) appeals from a decision of the Missouri Public Service Commission (PSC). The PSC's decision disallowed the recovery of approximately $1.5 million in costs incurred by ANG under a gas purchase contract with SEECO, Inc., an affiliated company. ANG claims that the PSC erred by disallowing recovery of

part of the costs despite an absence of proof that ANG's customers were harmed by the contract, that the PSC failed to properly utilize a prudence standard in evaluating the contract, and that the PSC acted arbitrarily in determining the amount to be disallowed. The PSC's decision also disallowed recovery of approximately $700,000.00 in "take or pay" (TOP) charges which ANG had already paid to unaffiliated interstate pipelines pursuant to tariffs approved by the Federal Energy Regulatory Commission. ANG claims that it should have been allowed to recover the TOP costs pursuant to the federal preemption doctrine and the filed rate doctrine, that the refusal to allow recovery of the TOP costs was inconsistent with other PSC decisions, and that the PSC's decision constituted an illegal taking in violation of ANG's due process rights.

## I. PSC Proceedings on the SEECO Gas Purchase Contract

ANG is a public utility operating a natural gas distribution system in a number of locations in Missouri. Pursuant to the statutory provisions in Chapter 393, RSMo 1994, the PSC has jurisdiction over the rates and charges which ANG imposes upon its retail customers in Missouri, and the PSC is responsible for ensuring that such rates and charges are "just and reasonable." In part, this case involves the reasonableness of certain charges which ANG has sought to pass on to its Missouri customers, and the procedure for evaluating such charges can be briefly described as follows.

In addition to the basic rates which ANG charges its customers, ANG can also recover from its customers the costs which it incurs in obtaining gas from its own suppliers. These additional charges are recovered through a two-part mechanism known as a purchased gas adjustment/actual cost adjustment (PGA/ACA) process. In the first half of this process, which is known as the PGA, ANG files annual tariffs in which it estimates its cost of obtaining gas over the coming year. This part of the process is prospective or forward-looking, and the PGA amounts are then included in the customers' bills over the ensuing twelve months. In the second

half of the process, ANG submits ACA filings, which are meant to correct any discrepancies between the PGA amounts which were prospectively billed to ANG's customers and the costs which, in retrospect, ANG actually incurred in obtaining gas from its suppliers.

The ACA filing procedure also provides the PSC with an opportunity to review the reasonableness of ANG's cost-recouping charges by evaluating ANG's gas acquisition practices during the relevant time period. If the costs have been appropriately incurred, the PSC allows ANG to pass them on to the customers. In order to determine if the costs can be passed through to customers as reasonable charges, the PSC employs a "prudence" standard, which will be more thoroughly described in our discussion of ANG's initial points on appeal.

In the proceedings at issue here, the PSC staff (the Staff) reviewed four ACA filings, which covered the gas costs incurred during a 48–month period from 1988 to 1992. Due to the illness of a key Staff witness, the Staff contracted with an out-of-state consultant, Mr. Steve Ruback, to conduct a prudence review for all four ACA periods. As part of his review of ANG's gas purchases over this time, Mr. Ruback evaluated an October 1, 1990, contract in which ANG agreed, for a ten-year period, to purchase approximately 70% of the gas supply for its Southeast Missouri District from SEECO, an affiliate of ANG (ANG is a division of Arkansas Western Gas Company (AWG) of Fayetteville, Arkansas, and both AWG and SEECO are wholly owned by the same entity, the Southwestern Energy Company).

In the contract, the purchase price of the gas was $1.90 per MCF (thousand cubic feet), and this price included a "premium" of approximately 54¢/MCF above the spot market price. Mr. Ruback acknowledged that some kind of premium was appropriate for this kind of contract, as compensation for the benefits of a long-term commitment and swing service on the part of the supplier. Mr. Ruback also acknowledged that, when ANG replaced its previous supplier with SEECO pursuant to the 1990 contract, the change resulted in lower overall gas costs.

However, Mr. Ruback also determined that there was inadequate evidence to demonstrate that ANG had maximized its gas cost savings by contracting with SEECO as opposed to contracting with some other reliable producer or marketer. Given the information available, Mr. Ruback felt he could not determine the appropriate amount for ANG to have paid as a premium for a supplier's willingness to provide long-term supply and swing service. In his testimony before the PSC, Mr. Ruback explained that it is extremely difficult to compare contract prices because nearly all long-term contracts are individually tailored and treated as confidential. Mr. Ruback asserted that, in order to demonstrate that its savings were maximized, ANG should have undertaken a thorough and well-documented process of requesting proposals from numerous suppliers.

It is undisputed that ANG did not engage in a thorough Request for Proposal (RFP) process before entering into its contract with SEECO. Instead, proposals were received from a total of three other potential suppliers in 1988, two years before the date of the contract, and none of the proposals were for time periods of more than two years. None of the proposals offered terms that were as favorable to ANG as those in the contract with SEECO.

Rodney Pennington, an expert witness who testified on behalf of ANG, stated that he had talked to a lot of local gas distributors about their gas acquisition practices in 1990, and none of them had used an RFP process. He said that the RFP process was "basically a nonexisting creature" at that time. In addition, ANG argued that it did not engage in a competitive bidding process because, based upon its lengthy experience in the region, it already knew the few suppliers that could meet its needs, and therefore it would be a waste of resources to send numerous requests for proposals to suppliers that ANG knew would be unable or unwilling to offer sufficient service.

ANG also offered testimony from an expert witness, Mr. John Underwood, who stated that both the process which ANG used to develop the SEECO contract and the premium paid by ANG under the SEECO contract were consistent with industry practices at the time. Mr. Underwood also performed an analysis to determine a range of reasonable prices which he would have expected ANG to pay for gas during the period in question, and he concluded that the SEECO contract price was at the low end of the range of reasonableness, and below what he would have expected from an arm's length negotiation.

In response to ANG's explanation for its failure to employ a competitive bidding process, Mr. Ruback maintained that ANG was asking the PSC to simply defer to its judgment—an approach which he characterized as an evasion of regulatory oversight. He stated that he did not believe that the failure to use an RFP process, by itself, rendered ANG's gas acquisition process unreasonable. However, he opined that the failure to use an RFP process, along with a lack of an accepted methodology to calculate the premium, the existence of an affiliated relationship, the inability to compare long-term contracts because of their individually tailored and confidential nature, and the absence of a contemporaneous cost study, combined to compel such a conclusion.

Mr. Ruback agreed that some premium above the spot price was appropriate in this type of contract, but he had no idea what a reasonable premium would have been for the SEECO contract for the time period in question. At a PSC hearing on this case, Mr. Ruback was cross-examined on this point by counsel for ANG:

Q. And I believe you previously told me that you have no idea whatsoever what an appropriate price would have been for the time period in question?

A. Yes. I don't have a price to give you.

Q. And you do not know the appropriate premium for the contract?

A. That's the question I just answered. I don't know.

Q. And furthermore you have no opinion and do not know whether the premium ANG actually paid was reasonable.

A. Correct.

Q. And you do not know whether it was imprudent?

A. Correct.

Ultimately, Mr. Ruback recommended that the PSC disallow the recovery, the entire $3,009,019.00 premium which ANG paid over the "spot" transaction price under the SEE-CO contract. At the same hearing, the Commissioners repeatedly asked Mr. Ruback if there was an appropriate amount which the PSC could allow as a premium above the spot market, and Mr. Ruback maintained that he could not form an opinion as to a suitable number:

Q. Mr. Ruback, if the Commission were to agree that the company is obligated in these affiliate circumstances to prove the reasonableness of its purchase and could conclude that it has not done so, but were to also conclude that a result of the allowance of no premium were unduly harsh, is there some way that—some proxy for some degree of premium that you could suggest the Commission look to?

A. I wish I could say that that's the first time that question has been asked of me. It's not. In my judgment, I would say that this case should have been settled someplace between zero and 100 percent. And how you determine whether it should be 50 percent or 40 percent is up to the trier of fact. I know not what number I would have come up with, but it would not have been as a result of a detailed analysis as to what I think a proper number would be. It would have been the result of a number that was fair, taking all the circumstances in the case and arriving at a settlement. ... I don't think there is a specific proxy that you can use.

Q. What, in your opinion, would be an appropriate number to put on the premium for the company to pay above the spot market price?

A. I don't know. I don't know. I don't have any of the information to give you that. Had I had responses to RFPs, I could have looked at that and given you a price. If I had a Mr. Underwood type of analysis, I could have agreed or disagreed with it and given you a number. Had there been an accepted methodology to value, I could have cranked out the numbers for you.... I wish I could give you a number, but I can't.

Q. In your opinion, there's no appropriate number that this Commission could allow for a premium above the spot market?

A. There is an appropriate number. I don't know what it is. As I suggested to one of the earlier Commissioners, I think they should look at the totality of the circumstances, recognizing the facts as they are in this case, and come up with a number.... I'm very sorry I don't have a number for you. I would have preferred to skip this hearing.

Then, the following exchange occurred as the Commissioners continued to press Mr. Ruback for an appropriate number to be paid as a premium above the spot market price:

Q. I'm not asking for what took place in settlement negotiations, for those numbers. I'm asking for your opinion as to a number that you would have found acceptable?

A. For purposes of settlement?

Q. Yes. Well—

A. Well, I'm sorry.

Q. No, for—An appropriate number for a premium to be paid above the spot market price?

A. Given all the limitations that I've given before—

Q. Yes.

A. —and if I was sitting in your shoes as a regulator hearing all that evidence, what would I recommend?

Q. Yes.

A. Half.

Later in the hearing, the Commissioner returned to the question of a finding of imprudence:

Q. I think it seems to me that you're recommending that the Commission disallow three million dollars' worth of gas costs without making a finding of imprudence?

A. Yes, unless that's been trimmed down to a million and a half based on some cost by the Commission.

Following the hearing, the PSC entered its Report and Order in this case, finding that "ANG's failure to contemporaneously evaluate other gas suppliers prior to entering into the SEECO contract, in conjunction with its failure to document its gas purchasing practices, including its evaluation of the premium to be paid under the SEECO contract, renders its past gas purchasing practices during the ACA periods in question imprudent." The PSC determined that ANG had, by its own actions, created a situation wherein there was insufficient data available from which to calculate an appropriate premium above spot price. The PSC concluded that to allow ANG to recover its full gas costs under such circumstances "would not only reward ANG for its imprudent conduct, but could also encourage other utilities to create or manipulate situations so that insufficient evidence or information exists from which other parties can formulate positions on the justness and reasonableness of the utility's proposed rates."

Having concluded that it would be inappropriate to allow ANG a full recovery of its gas costs under the SEECO contract, the PSC acknowledged that "there is a dearth of evidence in the record which would lend itself to a precise definition of the allowable versus the nonallowable portion of the premium above spot." The PSC determined that "the soundest evidence" from which it could determine how much of the premium would be allowable was Mr. Ruback's testimony that he would allow ANG to recover one-half of the premium. Accordingly, the PSC disallowed $1,504,509.50, which was half of the $3,009,019.00 premium which ANG paid over the "spot" transaction price under the SEECO contract.

In its decision, the PSC also stated that Mr. Ruback's recommendation was "consistent" with other evidence in the record:

In addition, there was evidence that the demand charge, which is a component of the premium, ranges from $0.20 to $0.30 [per thousand cubic feet]. This demand charge premium is a premium to provide

firm service and long-term service. It also provides a portion of the premium for flexibility. There was also testimony by ANG's witness Mr. Knight that he did not consider the SEECO contract to be a true fixed-price contract, as the price is redetermined annually rather than fixed for the entire length of the term. Given the above, the Commission is of the opinion that $0.20 to $0.30 reflects an appropriate premium for most of the major components of the contract requiring payment of a premium. This in turn is consistent with the recommendation of Mr. Ruback that only half the premium amount be allowed, as one-half of a premium of $0.54 is $0.27, which falls within the range of $0.20 to $0.30.

The $0.20 to $0.30 range which the PSC used to corroborate Mr. Ruback's recommendation comes from the testimony of Mr. Underwood, who stated that he would expect ANG to incur demand charges ranging from $0.20 to $0.30 per MMBtu [1] of contract entitlement. However, Dr. Underwood also testified that this range of demand charges must be adjusted for load factor, and that when so adjusted, the range of expected demand charges increases to $0.4445–$0.6667 per MMBtu.

## II. PSC Proceedings on the TOP Charges

The issue of TOP charges stems from historical changes in the economic relationships between three major players in the natural gas industry: the producers, who extract the gas at the wellhead; the interstate pipelines, who transport the gas extracted by the producers, and who also sell the gas wholesale; and the local distribution companies (LDCs)—such as ANG—which receive the gas from the pipelines and sell it at retail to commercial and residential consumers. Pipeline rates and contracts are regulated by the Federal Energy Regulatory Commission (FERC), and the rates imposed by LDCs upon its retail customers are regulated by state agencies such as the PSC.

---

**1.** MMBtu means million British thermal units; one MMBtu is the equivalent one cubic thousand feet.

During the late 1970s, LDCs purchased their gas almost exclusively from the pipelines, which acted both as wholesale buyers from the producers and as wholesale sellers to the LDCs. At this time, there were widely-held concerns about natural gas shortages, and the pipelines, in order to assure adequate supplies, agreed to "take or pay" clauses in their long-term gas purchase contracts with producers. These TOP clauses required the pipelines to pay for a minimum volume of natural gas in a given year, regardless of whether the pipeline actually took the minimum amount.

Then, in the 1980s, the FERC effectively restructured the natural gas industry, making it possible for LDCs like ANG to purchase gas directly from producers as opposed to buying it from the interstate pipelines; in such circumstances, the LDCs would only pay the pipelines for transporting the gas from the producer to the LDC. As the pipelines' sale of gas to the LDCs decreased, their TOP liabilities rose, because they were still obligated to pay producers for the minimum annual amount under their long-term contracts. In response to the economic hardship which this restructuring imposed upon the pipelines, the FERC established a procedure whereby the pipelines could recover at least some of their TOP costs by passing them on to LDCs like ANG. The LDCs, in turn, resorted to state regulatory agencies like the PSC to recover the TOP costs which had flowed down to them by passing said costs on to their own retail customers.

In Missouri, the PSC responded to the FERC's TOP scheme with its October 19, 1989, decision of *American–National Can Company v. Laclede Gas Company*, 30 Mo. PSC (N.S.) 32 (1989), holding that a gas company could lawfully pass its TOP costs through to its customers using the PGA mechanism. Pursuant to this decision, ANG recovered its TOP costs from its sales customers as costs of gas through the PGA mechanism, but failed to file tariffs to charge its interruptible transportation customers for their proportionate share of the TOP costs. Instead, ANG attempted to recover TOP costs from its interruptible transportation customers through the ACA process. The

total amount which ANG sought to collect from its interruptible transportation customers during the four ACA periods in question was $700,000.00.

Ricky Gunter, an ANG employee and witness, was asked why ANG had not yet filed a PGA tariff to recover its TOP costs from its interruptible transportation customers. Mr. Gunter replied that, after *American–National Can*, ANG took the following approach to recovering its TOP costs:

> ANG was made aware that the Staff was taking the position that recovery of TOP costs should be disallowed if not included in the ACA period in which the TOP costs were paid. Therefore, it was ANG's belief that issues related to TOP recovery would be addressed during ACA cases. ANG immediately took steps to include in the open ACA cases the TOP costs that had been previously paid. ANG took comfort in the fact that the Commission had taken the position that 100% of the TOP costs would be allowed for future recovery, that recovery would be through the PGA clause modified for recovery from the transportation customers and that ANG included the TOP costs in the open ACA periods which should alleviate Staff's concerns. ANG believed that as long as the ACA periods were open there would be no issues raised about the ultimate recovery of all TOP costs.

Mr. Gunter also stated that, in reliance upon these assumptions, "we directed our attention to other activities that were facing the company at the time."

In its decision, the PSC noted that "ANG was on notice as of October 19, 1989, the date of the *American–National Can Company* decision, that passthrough of its TOP charges would be permitted via its PGA mechanism, and that interruptible customers should pay their share of TOP costs, yet ANG has waited over five and one-half years and still has not filed an appropriate tariff to collect TOP charges from its interruptible transportation customers." The PSC determined that for ANG to now recover those costs through the ACA process would violate the filed rate doctrine and the proscription against retroactive ratemaking—concepts which will be

more thoroughly described in our discussion of ANG's latter points on appeal. The PSC concluded as follows:

> [T]he Commission determines that TOP costs which should have been recovered from interruptible transportation customers but which to date have not been recovered because of the lack of an appropriate tariff may not be recovered by ANG, either now or in the future. TOP charges incurred after the effective date of an appropriate tariff authorizing collection of these costs from interruptible transportation customers may be recovered in the future on a prospective basis.

The PSC's decision was later reversed by the Cole County Circuit Court, which determined that the PSC itself violated the filed rate doctrine as well as the federal preemption doctrine by refusing to allow ANG to recover the TOP costs in question. The Cole County Circuit Court also reversed the PSC's decision regarding the SEECO contract, concluding that there was insufficient evidence to support the PSC's finding that the SEECO contract was imprudent, and that the PSC acted arbitrarily in disallowing recovery of one-half of the contract premium.

### III. Analysis

Our standard of review in this case is well established. On appeal from a decision by the circuit court in a case adjudicated by the PSC, the appellate court reviews the decision of the PSC, not the judgment of the circuit court. *State, City of St. Joseph v. Pub. Serv. Com'n*, 713 S.W.2d 593, 595 (Mo. App. W.D.1986). The role of this court in reviewing a decision of the PSC is to determine whether the PSC's order is lawful and reasonable. *City of Oak Grove v. Public Serv. Com'n*, 769 S.W.2d 139, 141 (Mo.App. W.D.1989).

The lawfulness of a PSC decision is determined from the statutory authority of the PSC. *State ex rel. Intercon Gas v. PSC*, 848 S.W.2d 593, 597 (Mo.App. W.D.1993). In determining whether the PSC's decision was lawful, this court exercises unrestricted, independent judgment and must correct erroneous interpretations of the law. *Friendship*

*Vill. v. Public Serv. Com'n*, 907 S.W.2d 339, 344 (Mo.App. W.D.1995).

As to matters of reasonableness, this court determines whether the PSC's decision was supported by substantial and competent evidence on the whole record, whether the decision was arbitrary, capricious, or unreasonable, or whether the PSC abused its discretion. *Friendship Vill.*, 907 S.W.2d at 344–45. This court may not substitute its judgment for that of the PSC if the PSC's decision is supported by competent and substantial evidence. *City of Oak Grove*, 769 S.W.2d at 141. Also, this court will not substitute its judgment for that of the PSC on issues within the realm of the PSC's expertise. *Friendship Vill.*, 907 S.W.2d at 345.

In its first point on appeal, ANG challenges the PSC's decision that ANG cannot recover, from its customers, one-half of the premium it paid under the 1990 SEECO contract. ANG claims that the PSC erred by failing to properly utilize a prudence standard in evaluating the contract, and that the PSC erred by disallowing recovery of half of the premium despite an absence of proof that ANG's customers were harmed by the contract.

All charges for gas service must be just and reasonable. Section 393.130.1, RSMo 1994. The PSC has employed a "prudence" standard to determine whether a utility's costs meet this statutory requirement. If a utility's costs satisfy the prudence standard, the utility is entitled to recover those costs from its customers. The PSC has defined its prudence standard as follows:

> [A] utility's costs are presumed to be prudently incurred.... However, the presumption does not survive "a showing of inefficiency or improvidence."
>
> ... [W]here some other participant in the proceeding creates a serious doubt as to the prudence of an expenditure, then the applicant has the burden of dispelling these doubts and proving the questioned expenditure to have been prudent. (Citations omitted).

*Union Electric*, 27 Mo. PSC (N.S.) 183, 193 (1985) (quoting *Anaheim, Riverside, Etc. v.*

*Fed. Energy Reg. Com'n,* 669 F.2d 799, 809 (D.C.Cir.1981)). In the same case, the PSC noted that this test of prudence should not be based upon hindsight, but upon a reasonableness standard:

> [T]he company's conduct should be judged by asking whether the conduct was reasonable at the time, under all the circumstances, considering that the company had to solve its problem prospectively rather than in reliance on hindsight. In effect, our responsibility is to determine how reasonable people would have performed the tasks that confronted the company.

*Union Electric,* 27 Mo. P.S.C. at 194 (quoting *Consolidated Edison Company of New York, Inc.* 45 P.U.R. 4th 331 (1982)).

■ In the case at bar, ANG contends that the PSC erred by disallowing the cost of the premium under the 1990 SEECO contract without making a "specific finding as to whether or how the presumption of prudence was overcome and in fact never required Staff to come forward with evidence to overcome the presumption." In other words, ANG argues, the PSC's decision does not contain a finding that the Staff "raised a serious doubt."

However, in its decision, the PSC does explain how the presumption of prudence was overcome by the doubts Mr. Ruback raised about ANG's gas acquisition process. The PSC's decision stated that "ANG's failure to contemporaneously evaluate other gas suppliers prior to entering into the SEECO contract, in conjunction with its failure to document its gas purchasing practices, including its evaluation of the premium to be paid under the SEECO contract, renders its past gas purchasing practices during the ACA periods in question imprudent."

■ Nevertheless, ANG argues that, even if questions were raised about its gas acquisition practices, there was no evidence that these practices caused ANG's ratepayers to pay more for gas than if a different approach had been taken. ANG claims that, without evidence that the resulting gas costs were excessive or detrimental to its ratepayers, the PSC cannot deny ANG the recovery of its costs under the prudence standard.

In support of its contention, ANG cites PSC's own statements in a series of orders in another case. In its Order Denying Motion to Strike Testimony in Case No. GR–93–140, the PSC stated:

> WRI must show that its rates are reasonable. Conversely, Staff's burden is to show that WRI acted imprudently in making gas supply arrangements *which caused higher gas costs than if prudent decisions had been made.* A determination as to whether a particular decision was prudent involves consideration of the facts and circumstances in hand at the time the decisions were made. (Emphasis added.)

In the same case, the PSC also made the following statements in its Report and Order:

> A prudence review of this type must focus primarily on the cause(s) of the *allegedly excessive gas costs.* Put another way, the proponent of a gas cost adjustment must raise a serious doubt with the Commission as to the prudence of the decision (or failure to make a decision) that caused what the proponent views as *excessive gas costs.* . . . In addition, evidence about the particular controversial expenditures is needed for the Commission to determine the amount of the adjustment. . . . In addition, it is helpful for the Commission to have evidence as to the *amount that the expenditures would have been if the local distribution company had acted in a prudent manner.* The critical matter of proof is the prudence or imprudence of the decision from which expenses result. . . . *The amount of the proposed adjustment must be based on excessive expenditures incurred during the particular ACA period involved.* (Emphasis added.)

ANG is not alone in suggesting that, in order to disallow a utility's recovery of costs from its ratepayers, a regulatory agency must find both that (1) the utility acted imprudently (2) such imprudence resulted in harm to the utility's ratepayers. This dual requirement is implicitly accepted by the Illinois Court of Appeals in *Bus. & Prof. People v. Ill. Commerce Com'n,* 171 Ill.App.3d 948, 121 Ill.Dec. 746, 752, 525 N.E.2d 1053, 1059

(1 Dist.1988),[2] *See also New England Power Co.*, 31 F.E.R.C. 61,047 at 61,089, n. 38 ("Even if there were any imprudence on the part of NEP in 1971 and 1972 in agreeing to a contract which limited its ability to influence BEC's control over the project or to have recourse against BEC, there has been no showing that NEP's acceptance of the contract terms resulted in any injury to its ratepayers ... We agree with the reasoning of NEP's counsel at the oral argument that whether NEP was prudent in 1972 is relevant only if it caused harm to NEP's consumers").

Ultimately, the PSC's standards for the recoverability of ANG's costs arise from the statutory mandate that all charges made by a gas company be just and reasonable. Section 393.130.1. It would be beyond this statutory authority for the PSC to make a decision on the recoverability of costs, based upon a prudency analysis of gas purchasing practices, without reference to any detrimental impact of those practices on ANG's charges to its customers, such as evidence that the costs which ANG is seeking to pass on to its customers are unjustifiably higher than if different purchasing practices had been employed. Therefore the PSC's decision denying recovery of half the premium of the SEECO contract must be deemed unlawful.

In its second point on appeal, ANG claims that the PSC's decision to deny ANG recovery of $1,504,509.50, or half, of the premium was unreasonable because the only support for the PSC's determination was a reluctant and arbitrary statement made by Mr. Ruback at the hearing. However, because of our disposition of ANG's previous point on appeal, it is unnecessary for us to address this issue.

ANG's final three points on appeal concern the PSC's determination that ANG would be unable to recover $700,000.00 in TOP costs from its interruptible transportation customers because of the lack of an appropriate tariff. In its third point on appeal, ANG claims that the PSC erred in denying the

TOP costs because (1) the federal preemption doctrine mandates that ANG be allowed to recover all costs which have been approved by the FERC, (2) ANG had submitted tariff language to the PSC allowing recovery of the TOP costs in the context of the ACA filing and requested that the tariff be approved at the time the costs were allowed; and (3) recovery of the TOP costs would not constitute retroactive ratemaking as the recovery method proposed by ANG was prospective only and did not violate the filed rate doctrine.

The federal preemption and filed rate doctrines invoked by ANG involve the relationship between the federal and state rate-setting authorities. The FERC, whose jurisdiction extends only to the interstate aspects of the natural gas industry, focused only on the pipelines and their immediate customers—LDCs and other large end users—in ordering the flowthrough of the TOP costs which pipelines had paid to producers. Insofar as the LDCs have further passed these TOP costs on to their own retail customers, such additional flowthrough has occurred under the auspices of state regulatory agencies like the PSC.

■ Because of the potential conflict between the federal and state rate-setting agencies, the "filed rate doctrine" was developed as an outgrowth of straightforward principles of Federal preemption and the Supremacy clause. *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 963, 106 S.Ct. 2349, 2355, 90 L.Ed.2d 943 (1986); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). The filed rate doctrine holds that interstate power rates fixed by the FERC must be given binding effect by state utility commissions determining intrastate rates. *Nantahala*, 476 U.S. at 962, 106 S.Ct. at 2354.

■ The cases hold, and the parties do not dispute, that the filed rate doctrine applies to the TOP costs at issue here because they are FERC-approved costs associ-

---

**2.** In *Laclede Gas Co.*, 10 Mo. P.S.C. (N.S.), 442, 451 (1962), the PSC acknowledged that the statutory authority of the Illinois Commission is, "in all material respects, substantially identical with" the PSC's own statutory authority.

ated with the procurement of gas from wholesale suppliers. *General Motors v. Illinois Commerce Com'n,* 143 Ill.2d 407, 158 Ill.Dec. 537, 543, 574 N.E.2d 650, 656 (1991)(citing *Nantahala,* 476 U.S. at 966, 106 S.Ct. at 2356–57). The filed rate doctrine prohibits a state regulatory commission from "trapping" FERC-approved costs by preventing a distributor from fully recovering those costs from its retail customers. *Nantahala,* 476 U.S. at 970, 106 S.Ct. at 2358–2359.

■ The filed rate doctrine also precludes a regulated utility from collecting any rates other than those properly filed with the appropriate regulatory agency. *Nantahala,* 476 U.S. at 963, 106 S.Ct. at 2355; *Arkansas,* 453 U.S. at 577, 101 S.Ct. at 2930. This aspect of the filed rate doctrine constitutes a rule against retroactive ratemaking or retroactive rate alteration. *Columbia Gas Transmission Corp. v. F.E.R.C.,* 831 F.2d 1135, 1140 (D.C.Cir.1987). In its discussion of the doctrine, the *Arkansas* court explains that it explicitly prohibits an entity from "imposing a rate increase for gas already sold," 453 U.S. at 578, 101 S.Ct. at 2931, and states, in a footnote, that an entity "may not *impose* a retroactive rate alteration and, in particular, may not order reparations." *Id.* at n. 8 (emphasis in original).

The PSC has determined that the pass-through of an LDC's TOP costs through PGA tariff provisions does not violate the filed rate doctrine's prohibition against retroactive ratemaking. *American National Can Company v. Laclede Gas Company,* 30 Mo. P.S.C. (N.S.) 32, 36 (1989). Such a ruling is consistent with the filed rate doctrine's underlying policy of predictability, meaning that if a utility is bound by the rates which it properly filed with the appropriate regulatory agency, then its customers will know prior to purchase what rates are being charged, and can therefore make economic or business plans or adjustments in response. *Associated Gas Distributors v. F.E.R.C.,* 893 F.2d 349, 354 (D.C.Cir.1989); *Columbia,* 831 F.2d at 1141. In other words, under Missouri's regulatory scheme, if an LDC seeks to recover TOP costs by filing PGA tariffs, those tariffs will provide advance notice to customers of prospective charges, allowing the customers to plan accordingly, and the filed rate doctrine's goal of predictability is satisfied.

■ However, in the case at bar, ANG did not utilize PGA tariff provisions in order to pass through its TOP costs; instead, ANG attempted to accomplish this task through the means of its ACA filings. The PSC concluded that, unless ANG recovered its TOP costs by using the PGA tariff mechanism, the policy of the filed rate doctrine would remain thwarted:

> The Commission finds that ANG may not collect from its interruptible transportation customers TOP costs incurred but not billed because of the lack of a tariff authorizing the Company to do so. ANG may only recover TOP costs incurred after the effective date of an appropriate tariff authorizing collection of TOP costs from interruptible transportation customers. To hold otherwise would be prejudicial to ANG's customers. In this regard the Commission is persuaded by the approach of the federal court in *Associated Gas,* which indicated that the appropriate inquiry seeks to identify the purchase decisions to which the costs are attached. The petitioners in *Associated Gas* successfully argued that had the utility's customers known of the charges, they could have altered their decisions and reduced their gas costs, and the court emphasized notice to the customers in rendering its decision.

We cannot conclude that the PSC erroneously interpreted the law in holding that ANG could only recover its TOP costs by filing an appropriate PGA tariff to do so. We also agree with the PSC that its decision does not conflict with *American National Can Company,* which allows for the recovery of TOP costs through the PGA tariff mechanism, not the ACA process.

■ However, the PSC did err by also concluding that ANG could not then proceed to file PGA tariffs to seek recovery of the TOP costs for the periods in question. By holding that the ANG could never recover its TOP costs because it had not yet filed the requisite PGA tariffs would truly trap the TOP costs with ANG, which, pursuant to the

filed rate doctrine, the PSC cannot do. Therefore, the PSC's decision that ANG can never recover its TOP costs must be deemed unlawful.

In its fourth and fifth points on appeal, ANG claims that the PSC's decision to disallow recovery of the TOP costs was unreasonable, arbitrary, and capricious, and was tantamount to an unconstitutional taking or confiscation of ANG's property. However, we need not address these claims because of our resolution of the TOP issue in our disposition of ANG's third point on appeal.

The judgment reversing the Report and Order of the PSC is affirmed and the cause is remanded to the circuit court with directions to remand this cause to the PSC for further proceedings consistent with this opinion.

All concur.