**In the Matter of ATMOS ENERGY CORPORATION'S 2008–2009 Purchased Gas Adjustment and Actual Cost Adjustment, Respondent,**

**Public Service Commission, Respondent,**

**v.**

**OFFICE OF PUBLIC COUNSEL, Appellant.**

**No. WD 74916.**

Missouri Court of Appeals, Western District.

Dec. 18, 2012.

James M. Fischer, Jefferson City, MO, for Respondent Atmos Energy.

Jennifer L. Heintz, for Respondent Public Service Commission.

Marc D. Poston, Jefferson City, MO, for Appellant Office of Public Counsel.

Before Division One: THOMAS H. NEWTON, Presiding Judge, JOSEPH M. ELLIS, Judge and GARY D. WITT, Judge.

JOSEPH M. ELLIS, Judge.

The Office of Public Counsel ("the OPC") appeals from an order entered by the Missouri Public Service Commission ("the PSC") approving the 2008–2009 actual cost adjustment rates for Atmos Energy Corporation ("Atmos"). The OPC claims that the PSC's order is unlawful and un-

reasonable in that it violates the Affiliate Transaction Rule, 4 CSR 240–40.016, and is not supported by competent and substantial evidence. For the following reasons, the PSC's order is affirmed.

The PSC is a state agency established by the Missouri General Assembly to regulate public utilities in the state, including natural gas companies. The OPC is a state agency charged with representing utility customers in cases before the PSC and on appeal of PSC orders pursuant to §§ 386.700 and 386.710.[1]

Atmos is a public utility operating a local distribution company ("LDC") providing retail natural gas service to approximately 65,000 residential and business customers in Missouri. As an LDC, Atmos contracts with gas marketing companies to purchase the natural gas required by its customers in its various service areas, utilizes its pipeline capacity to transport that natural gas to the service area, and distributes the natural gas to homes and businesses within the service area. The gas marketing companies used by Atmos are chosen for each service area through a competitive bidding process. The PSC has jurisdiction over Atmos.

In addition to its basic rates, Atmos is allowed to recover from its customers the costs of acquiring the supply of natural gas it uses to service those customers. This commodity cost of the natural gas is recovered through a two-part process known as the Purchased Gas Adjustment/Actual Cost Adjustment ("PGA/ACA") process. During the PGA phase, Atmos prospectively submits tariffs adjusting the rate it charges its customers to recover the estimated cost of acquiring the necessary nat-

ural gas. In the ACA phase, the PSC retrospectively reviews Atmos's actual natural gas purchases to determine whether the rate that the company charged to its customers was correct and whether the decisions made by Atmos in making its gas purchases were prudent.

This appeal involves the PSC's review of Atmos's 2008–2009 ACA filings.[2] On December 30, 2010, the PSC Staff recommended that the PSC disallow a portion of the ACA amounts claimed by Atmos for the Hannibal and Butler service areas because an unregulated affiliate of Atmos had realized a profit on those transactions.[3] The Staff proposed disallowing recovery in the amount of profit realized by the affiliate entity. Atmos challenged the Staff's recommendation, and a hearing was conducted before the PSC on September 14, 2011. The PSC ultimately rejected the recommendation of its Staff and approved the ACA amounts submitted by Atmos. The OPC appeals from that decision.

"Our review of commission decisions is limited to determining whether or not the commission exceeded its constitutional and statutory authority or otherwise acted unlawfully; whether or not competent and substantial evidence on the whole record supported its decision; whether or not its decision was based on lawful procedure or a fair trial; and whether or not the commission acted arbitrarily, capriciously, unreasonably, or abused its discretion." *State ex rel. Public Counsel v. Public Serv. Comm'n*, 274 S.W.3d 569, 573 (Mo.App. W.D.2009) (citing § 536.140). "The party seeking to set aside the PSC's order has the burden to prove by clear and satisfactory evidence that the order is unlawful or

---

1. All statutory references are to RSMo 2000 unless otherwise noted.

2. The review covered the period from September 1, 2009, through August 31, 2009.

3. The amount of disallowance recommended by the Staff was recalculated several times with the Staff eventually recommending that $337,226.61 be disallowed.

unreasonable." *Office of Public Counsel v. Missouri Public Serv. Comm'n,* —— S.W.3d —— at —— (Mo.App. W.D.2012). "We presume the commission's fact-finding to be correct until the appellant establishes the contrary." *State ex rel. Public Counsel,* 274 S.W.3d at 573.

In its sole point on appeal, the OPC claims that the PSC erred in approving the 2008–2009 ACA rates for Atmos "because the order is unlawful and unreasonable and subject to review under Section 386.510 RSMo, in that the order violates 4 CSR 240–40.016 and is not based upon competent and substantial evidence." 4 CSR 240–40.016 contains the PSC's rules related to transactions with unregulated marketing affiliates, and the OPC argues that Atmos failed to comply with these rules in entering into a gas purchasing agreement with Atmos Energy Holdings, Inc. ("AEM"), an unregulated natural gas marketing affiliate of Atmos.

■■■■ As this Court noted in *Office of Public Counsel v. Missouri Public Serv. Comm'n,* —— S.W.3d —— at —— (Mo. App. W.D.2012):

> All charges for gas service must be just and reasonable. To determine whether a utility's costs meet this statutory standard, the PSC employs a prudence standard. If a utility's costs satisfy the prudence standard, the utility is entitled to recover those costs from its customers.
>
> A utility's costs are presumed to be prudently incurred. The presumption does not, however, survive a showing of inefficiency or improvidence. If some other participant in the proceedings alleges that the utility has been imprudent in some manner, that participant has the burden of creating a serious doubt as to the prudence of the expenditure. If that

is accomplished, the utility then has the burden of dispelling those doubts and proving the questioned expenditure was in fact prudent. The prudence test should not be based upon hindsight but upon reasonableness[.]

> The utility's conduct should be judged by asking whether the conduct was reasonable at the time, under all the circumstances, considering that the utility had to solve its problem prospectively rather than in reliance on hindsight. In effect, the PSC's responsibility is to determine how reasonable people would have performed the tasks that confronted the utility.

(internal quotations and citations omitted). "In order to disallow a utility's recovery of costs from its ratepayers, a regulatory agency must find both that (1) the utility acted imprudently [and] (2) such imprudence resulted in harm to the utility's ratepayers." *State ex rel. Assoc. Natural Gas Co. v. Public Service Comm'n,* 954 S.W.2d 520, 529 (Mo.App. W.D.1997). "The prudence standard applies to affiliate transactions." *Office of Public Counsel,* —— S.W.3d —— at —— (citing *State ex rel. Public Counsel,* 274 S.W.3d at 573).

■■■■ In regard to transactions with an affiliated marketing entity, 4 CSR 240–40.016(3)(A) provides:

> (A) A regulated gas corporation shall not provide a financial advantage to an affiliated entity. For the purpose of this rule, a regulated gas corporation shall be deemed to provide a financial advantage to an affiliated entity if—
>
> 1. It compensates an affiliated entity for information, assets, goods, or services above the lesser of—
>
> A. The fair market price; or
>
> B. The fully distributed cost[4] to the regulated gas corporation to

4. The term "fully distributed cost" ("FDC") is defined in 4 CSR 240–40.016(1)(F) as:

provide the information, assets, goods, or services for itself.

"This provision of the Affiliate Transaction Rules is known as the asymmetrical pricing standard." *Office of Public Counsel,* —— S.W.3d —— at ——. "In accordance with the asymmetrical pricing standard, Atmos was required to compensate AEM for gas marketing services at the lower of the fair market price or the fully distributed cost of providing that service." *Id.* at ——.

"The Affiliate Transaction Rules also provide evidentiary standards for affiliate transactions to assure compliance with the asymmetrical pricing standard." *Id.* at ——. "A regulated gas corporation must obtain competitive bids when it purchases goods or services from an affiliate or demonstrate why competitive bids were unnecessary or inappropriate." *Id.* (citing 4 CSR 240–40.016(4)(A)). "In addition, in transactions that involve either the purchase or receipt of goods or services by a regulated gas utility from an affiliate, the utility shall document both the fair market price of such goods or services and the fully distributed cost to the utility to produce the goods or services for itself." *Id.* (citing 4 CSR 240–40.016(4)(B)). The regulations also contain the following record-keeping requirements related to affiliate transactions:

[E]ach regulated gas corporation shall maintain the following information regarding affiliate transactions on a calendar year basis:

1. Records identifying the basis used (e.g., fair market price, fully distributed costs, etc.) to record all affiliate transactions; and

2. Books of accounts and supporting records in sufficient detail to permit verification of compliance with this rule.

4 CSR 240.40–016(5)(C).

■■■ Despite these foregoing provisions, however, nothing in 4 CSR 240.40–016 serves to "modify existing legal standards regarding which party has the burden of proof in commission proceedings." 4 CSR 240.40–016(7)(C). "This means that the regulation does not modify the existing burden of proof." *State ex rel. Public Counsel,* 274 S.W.3d at 578 (addressing identical language in 4 CSR 240.40.015, the regulation applicable to transactions with non-marketing affiliates). Thus, although Atmos purchased the natural gas from its affiliate, AEM, the PSC properly presumed that Atmos was prudent in its purchase of the natural gas, unless the Staff or the OPC presented evidence that raised serious doubt concerning the prudence of the expenditure. *Id.*

Parroting its claims in *Office of Public Counsel v. Missouri Public Serv. Comm'n,* —— S.W.3d —— at —— (Mo.App. W.D. 2012), the OPC "argues that Atmos failed to follow the Affiliate Transactions Rules when it did not determine its fully distributed cost to supply the gas for itself and that the PSC unlawfully determined that Atmos's fully distributed cost was greater than the fair market price."[5] As we noted

a methodology that examines all costs of an enterprise in relation to all the goods and services that are produced. FDC requires recognition of all costs incurred directly or indirectly used to produce a good or service. Costs are assigned either through a direct or allocated approach. Costs that cannot be directly assigned or indirectly allocated (e.g., general and administrative)

must also be included in the FDC calculation through a general allocation.

5. Indeed, significant portions of the OPC's brief on appeal appear to have been copied word for word from its brief in *Office of Public Counsel v. Missouri Public Serv. Comm'n,* —— S.W.3d —— at —— (Mo.App. W.D.2012).

in rejecting this argument in our prior opinion:

> neither the Staff nor the OPC challenged, in the proceedings below, Atmos's decision to purchase its gas supplies through gas marketing companies rather than by using in-house gas marketing experts. They did not suggest that the fully distributed cost to Atmos was lower than the fair market price, and the Staff did not seek to disallow any of Atmos's gas costs based on a fully distributed costs argument.... Rather, the Staff and the OPC's focus in this case was on the fair market price of the gas marketing services provided by AEM.

*Id.* at ——–——. Indeed, far from challenging the PSC's conclusion that the fully distributed price would have been greater than the fair market price, the testimony presented by the Staff appears to concede this issue, and the OPC offered no argument to the contrary. Furthermore, Atmos presented general testimony at the hearing, which the PSC deemed credible, that the fully distributed cost would have been more than the amount paid to AEM because of its current lack of infrastructure and personnel to perform the requisite services. In addition, PSC found that "[g]as-marketing companies can aggregate all of their customers' gas requirements and therefore purchase larger amounts of gas from suppliers and obtain better gas prices than utilities. For that reason, it is unlikely that large natural gas producers would be willing to sell natural gas directly to Atmos in the small baseload quantities that the company would purchase for its relatively small service area." The PSC noted that the Staff did not voice any concern over "Atmos's decision to obtain its gas supplies through gas marketing companies rather than purchasing those supplies using in-house gas marketing personnel." Based on the foregoing, the PSC found "that Atmos'[s] fully distributed cost of providing gas-marketing services through its own employees would exceed the market price for those gas-marketing services as established by a competitive bidding process among gas marketing companies."

 As neither the Staff nor the OPC raised any serious concerns that the fully distributed cost would have been lower than the fair market price, the PSC cannot be deemed to have erred in relying on the presumption that Atmos acted prudently in paying AEM the fair market price. *See Id.* at —— ("Although Atmos purchased its gas [for the relevant] service area from its affiliate AEM, the PSC properly presumed that Atmos was prudent in the purchase until the Staff or OPC presented evidence that raised a serious doubt concerning the prudence of its expenditures."). In the absence of evidence or argument before the PSC that the fully distributed cost would have been greater than the fair market price, the PSC was free to accept as credible the evidence presented and to find that the fully distributed price would have been greater than the fair market price.[6]

---

6. This said, the PSC, acting *sua sponte* or responding to a third party complaint, has the general authority under 4 CSR 240-40.016(7)(B) to investigate the operations of regulated gas corporations or affiliate entities to ensure compliance with the rules, including the requirement that the utility document both the fair market cost and the fully distributed cost for the gas obtained from an affiliate gas marketing entity, and 4 CSR 240-40.016(9)(A) gives the PSC the authority to enforce the rules through the application of any remedy available to the PSC. Thus, whether in the course of a rate adjustment hearing or at any other given time, the PSC has the discretion to investigate a regulated company to ensure compliance with the rules related to transactions with affiliated entities

██ The OPC next argues, as it did in the prior case, "that the PSC unlawfully concluded that the transactions between Atmos and AEM established the fair market price because such transactions were not conducted at arm's length." *Id.* at ——. The OPC claims that, despite the higher bids from other non-affiliated suppliers, any dealings between Atmos and AEM cannot be deemed to have occurred at arm's length and, therefore, cannot establish the fair market value for the natural gas. The OPC contends that an open bidding process is insufficient to prove the fair market value of the natural gas and that a utility must establish the fair market price by some other method.

In making this argument, the OPC asserts that CSR 240–20.015(2) placed the initial burden on Atmos to demonstrate that it had paid its affiliate fair market value. That assertion is incorrect. *State ex rel. Public Counsel,* 274 S.W.3d at 578. "Regulation 240–20.015(6)(c) says, 'This rule does not modify existing legal standards regarding which party has the burden of proof in the commission proceeding.'" *Id.* "This means that the regulation does not modify the existing burden of proof. Although [the utility] purchased [goods or services] from its affiliates, the commission properly presumed that the [utility] was prudent in its purchase of the [goods or services], until the State or Public Counsel presented evidence that raised a 'serious doubt' concerning the prudence of its expenditure." *Id.*

██ In response to the OPC's argument, this Court previously noted:

The parties agree that the fair market value of a good or service is '[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market in an arm's-length transaction.'

*Black's Law Dictionary 1691* (9th ed.2009). Arm's length transactions are defined as 'dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power. *Black's Law Dictionary 123* (9th ed.2009).

The PSC found that the fair market value of the transactions was established in this case by the competitive bidding process Atmos used to obtain its Missouri gas supply.... An open market composed of willing buyers and willing sellers who are not related or on close terms establishes the fair market price of a good or service. In this case, the competitive bid process undertaken by Atmos, that included non-affiliates, produced the fair market price for gas marketing services in its eight Missouri service areas.... Atmos received bids from its affiliate AEM and non-affiliate gas marketing companies. AEM submitted the lowest bid for two of the services areas. The contracts for the other service areas in Missouri were awarded to non-affiliate gas marketing companies.... Because of the competitive bidding process, which is required by 4 CSR 240–40.016(4)(A), Atmos paid less for gas marketing services provided by AEM than it would have paid for the same services provided by a non-affiliate company ... Nothing in the record indicated that Atmos tended to favor its affiliate in the bidding process. And the Staff and the OPC did not raise a serious doubt about the fairness of the bidding process.

*Office of Public Counsel,* —— S.W.3d —— at —— – ——. For these same reasons, we again reject the claims of the OPC.

and to enforce any deficiency by means of any remedy available to the PSC.

Next, the OPC claims that the fair market price of the natural gas acquired from AEM should have been calculated based on AEM's cost of acquiring the natural gas from its upstream suppliers. In previously rejecting this same argument, this Court stated:

[T]he Staff's proposed disallowance equaled the gross profit AEM earned on the transaction with Atmos suggesting that it was imprudent for AEM to profit on services it provided to Atmos. This court recently reviewed the similar issue of whether an unregulated affiliate of an electric company was required to sell its services to its regulated affiliate utility at its cost without earning a profit. This court agreed with the PSC's conclusion that the utility had no power or obligation to change its unregulated affiliate's decision to stop selling power to it at cost and instead seek much greater profits by selling on the newly available market. Indeed, forcing the unregulated affiliate's board to lose out on profits by selling its electricity to the utility at cost instead of selling it on the open market likely would have resulted in the board violating its fiduciary duty to manage the corporate business solely in accord with the corporation's interest. In this case, the OPC cites no cases holding that a utility acts imprudently in transacting business with its affiliate simply because the affiliate earns a profit on the transaction. Indeed, restricting an affiliate's ability to earn a profit could ultimately deprive a utility of the best price where the affiliate, which otherwise would have submitted the lowest bid, decides not to sell to the utility. As a regulated utility, Atmos certainly had an obligation to obtain natural gas for its ... service area at the lowest prudent cost. It also had an obligation to engage in fair dealing with its affiliate. It did so by buying the gas from AEM, who offered the best bid for reliable supply at the least cost to the benefit of the ratepayers.

*Id.* at ————. We again reject the OPC's argument for these same reasons.

■ In short, the PSC considered the issues before it and made a factual finding that Atmos had charged its customers the lesser of the fair market price and the fully distributed cost for the gas supply acquired from AEM. Indeed, neither the Staff nor the OPC raised any serious doubt that the fully distributed cost would have been lower than the fair market price. Furthermore, sufficient and competent evidence supported the PSC's finding that that Atmos did not act imprudently in its transaction with AEM. The PSC's order was both lawful and reasonable. Accordingly, the order of the PSC is affirmed.

All concur.