STATE ex rel. PUBLIC COUNSEL; State ex rel. Jeremiah Nixon, State ex rel. Union Electric Company, Appellants,

v.

PUBLIC SERVICE COMMISSION, Respondent.

Nos. WD 69259, WD 69270, WD 69297.

Missouri Court of Appeals, Western District.

Jan. 13, 2009.

Lewis R. Mills, Jr., Robert E. Carlson, Jefferson City, MO, and James B. Lowery, Columbia, MO, for appellant.

Steven R. Dottheim, Jefferson City, MO, for respondent.

PAUL M. SPINDEN, Judge.

The appellants, Union Electric Company (UE),[1] the State of Missouri, and the Office of Public Counsel, appeal separately the Public Service Commission's order authorizing UE, an electric utility, to increase its electricity rates. Because the three appeals raise common issues, we consolidate them.

UE initiated this case on July 7, 2006, when it filed tariff sheets seeking to implement an annual general rate increase of approximately $360 million. The commission suspended the tariff's effective date until June 4, 2007, so it could investigate the request. Numerous parties, including the State, intervened. After local hearings and the filing of witness testimony by the parties, the commission convened an evidentiary hearing on March 12, 2007. After a three-week hearing, the commission issued its decision on May 22, 2007, authorizing UE to increase its rates, but by only approximately $43 million.

---

1. UE is a subsidiary of Ameren, and does business under the fictitious name, AmerenUE. Throughout these proceedings, the commission referred to UE as AmerenUE. We prefer to use the entity's corporate name.

On appeal, UE presents two points, the State presents four points, and Public Counsel presents eight. When possible, we address the points together.

UE complains of the commission's authorizing a rate of only $43 million on the ground that the commission based the rate on an improper 10.2 percent rate of return on UE's equity. UE asserts that, pursuant to undisputed evidence, the commission should have used an 11 percent rate of return because that was the average rate for Midwest electric utilities. The State and Public Counsel, on the other hand, assert that the evidence did not justify a rate of return above 9.8 percent.

Our review of commission decisions is limited to determining whether or not the commission exceeded its constitutional and statutory authority or otherwise acted unlawfully; whether or not competent and substantial evidence on the whole record supported its decision; whether or not its decision was based on lawful procedure or a fair trial; and whether or not the commission acted arbitrarily, capriciously, unreasonably, or abused its discretion. Section 536.140, RSMo 2000 (recognized as applicable to commission cases by *State ex rel. Chicago, Rock Island & Pacific Railroad Company v. Public Service Commission*, 312 S.W.2d 791, 794–95 (Mo. banc 1958)). We presume the commission's fact-finding to be correct until the appellant establishes the contrary. *Coffman v. Public Service Commission*, 154 S.W.3d 316, 320 (Mo.App.2004).

Section 393.270, RSMo 2000, governs the commission's authority to fix utility rates. It says:

2. After a hearing and after such investigation as shall have been made by the commission or its officers, agents, examiners or inspectors, the commission within lawful limits may, by order, fix the maximum price of gas, electricity, water or sewer service not exceeding that fixed by statute to be charged by such corporation or person, for the service to be furnished; and may order such improvement in the manufacture, distribution or supply of gas, in the manufacture, transmission or supply of electricity, in the distribution or supply of water, in the collection, carriage, treatment and disposal of sewage, or in the methods employed by such persons or corporation as will in its judgment be adequate, just and reasonable.

. . . .

4. In determining the price to be charged for gas, electricity, or water the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies.

Pursuant to § 393.270.4, the commission calculated UE's revenue requirement by adding the utility's operating expenses to its plant depreciation, taxes, and rate of return on equity and then multiplying this total by the utility's rate base. The parties concede that this was a proper calculation. They focus their appeal on the commission's calculation of UE's rate of return on equity.

 The rate of return is, essentially, the amount that a utility must pay to secure financing from debt and equity investors. *State ex rel. Missouri Gas Energy v. Public Service Commission*, 186 S.W.3d 376, 383 (Mo.App.2005). To determine the proper rate of return, the commission should factor "(i) the ratio of debt and equity to total capital, and (ii) the cost and (iii) weighted cost for each of these

capital components." *Id.* Determining a rate of return on equity, however, is imprecise and involves balancing a utility's need to compensate investors against its need to keep prices low for consumers. *Id.*

In calculating UE's rate of return on equity, the commission used what it termed a zone of reasonableness test in which it presumed that any rate that was within 100 basis points of the national average was reasonable. Applying its zone of reasonableness test to UE's request, the commission found that the national average was 10.36 percent and concluded that UE's rate of return on equity should be 10.2 percent. The commission explained:

> Based on its analysis of the expert testimony offered by the parties, and on its balancing of the interest of the company's ratepayers and shareholders, the Commission finds that 10.2 percent is fair and reasonable return on equity for [UE] that will allow it to compete in the capital market for the funds needed to maintain its financial health[ ].

UE complains that, because the commission found that it was an average electric utility, the commission was obligated to set its rate of return on equity at the 11 percent average for other similar integrated electric utilities in the region. UE contends that, because it was an "average company with an average risk," the zone of reasonableness test did not apply to its rate request. It argues that, as a matter of law, the commission's finding that it was an average electric utility ended the issue by obligating the commission to set its rate at the average.

UE does not cite any authority for this proposition, and logic does not mandate it. The average rate, although an important factor, is far from a precise indicator of a proper rate. Averages do not factor unusual circumstances and other significant situations. UE's own evidence, which it asked the commission to adopt, established that, although the average rate for 11 Midwest utilities was 11 percent, eight of those companies had rates that were lower than 11 percent and four had rates lower than 10.2 percent. Were the commission required to give UE the average rate of 11 percent simply because UE was an average electric utility, UE would have the fourth highest rate of return on equity in the Midwest.

UE alternatively argues that the commission erred in using the national, instead of the regional, average rate of return on equity as its baseline. Even had the commission used the regional rate of 11 percent, UE's claim still would fail because the commission's conclusion that UE's rate should be 10.2 percent fits within the zone of reasonableness for either 11 percent or 10.36 percent. The zone of reasonableness for 11 percent is 10–12 percent, and for 10.36 percent it is 9.36–11.36 percent. The United State's Supreme Court has instructed the judiciary not to interfere when the commission's rate is within the zone of reasonableness. *See In re Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) ("courts are without authority to set aside any rate selected by the Commission [that] is within a 'zone of reasonableness'"). Moreover, the commission found that UE was seeking to raise capital across the entire nation, which supported the commission's using the national average. The commission was free to make this factual finding. *State ex rel. Associated Natural Gas Company v. Public Service Commission,* 37 S.W.3d 287, 294 (Mo.App.2000).

■ UE next contends that the commission erred in applying the national average because it did not distinguish between integrated and non-integrated electric utilities. Integrated utilities, UE asserts, have

different average rates of returns on equity than non-integrated utilities. The only authority on which UE relies in making this argument is the testimony of Kathleen McShane, executive vice president of a consulting firm, concerning business risk. UE points to her testimony that the "business risks of a 'wire only' utility are lower th[a]n those of an integrated utility[;] thus[,] their allowed rate of return cannot be viewed as indicative of a reasonable rate of return for UE." This generic testimony regarding business risks did not support UE's contention that the commission was obligated to distinguish between integrated and non-integrated utilities. Even if it did, the commission was free to disbelieve it. *Id.*

■ The State and Public Counsel assert that the commission set UE's rate of return too high. They note that the commission accepted the testimony of Michal Gorman, an energy consultant, who opined that UE's rate of return on equity should be 9.8 percent. The State and Public Counsel assert that the commission's acceptance of Gorman's opinion obligated it to adopt the 9.8 percent rate. Gorman was among six experts who testified. Each recommended a different rate of return, ranging from 12.2 percent to 9 percent. The commission explained why it accepted Gorman's recommendation but still set UE's rate of return at 10.2 percent:

> Of the witnesses who testified in this case, Michael Gorman ... d[id] the best job of presenting the balanced analysis that the Commission seeks. His overall recommendation was for a return on equity of 9.8 percent. Gorman performed three different analyses to arrive at his overall recommendation. His Constant Growth Discounted Cash Flow

(DCF) analysis resulted in a recommended return on equity of 9.2 percent[. H]is Bond Yield Plus Risk Premium Model analysis result[ed] in a recommended return on equity of 10.2 percent, and his Capital Asset Pricing Model (CAPM) result[ed] in a recommended return on equity of 10.3 percent. Gorman's overall recommendation of 9.8 percent is a blending of these three analyses.

> In examining Gorman's three analyses, it seems the results of the DCF analysis are somewhat inconsistent with the results of the other two analyses. If the results of the Risk Premium and CAPM are accepted as more reasonable, Gorman's recommendation is pushed up to the low 10 percent area.[2]

Competent and substantial evidence supported this finding. The commission was not obligated to believe all of Gorman's testimony, and it was free to reject his constant growth discounted cash flow analysis as inconsistent with the other two tests and, accordingly, to modify his recommended 9.8 percent rate of return. *Id.* Averaging Gorman's other studies results in a rate of return on equity of approximately 10.25 percent, which is consistent with the commission's rate of 10.2 percent.

■ The State next asserts that the commission was obligated to reduce UE's rate of return on equity as punishment for substandard performance during the storms of 2006 and 2007. Section 393.270.4 authorizes the commission to "consider all facts which in its judgment have any bearing upon a proper determination of [a rate]." The courts long have held that adequacy of a utility's service may be a factor in setting the utility's rate. *Market Street Railway Company v. Railroad Commission of the State of Califor-*

---

2. We omitted the footnotes.

*nia,* 324 U.S. 548, 563–64, 65 S.Ct. 770, 89 L.Ed. 1171 (1945); *D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission,* 466 F.2d 394, 419–20 (D.C.Cir.1972). Courts have held consistently that a utility commission is free to award a higher rate of return for superior service or lower a rate of return for inferior service. *D.C. Transit System,* 466 F.2d at 419 (listing cases). Indeed, the General Assembly's use of "may" in § 393.270.4 indicates that it granted the commission discretion to determine which facts it would use in setting a utility's rates because use of "may" in a statute indicates that "the conferee of ... power has discretion in the exercise of the power." *Estate of Parker,* 25 S.W.3d 611, 616 (Mo.App. 2000) (*quoting State ex rel. Nixon v. Boone,* 927 S.W.2d 892, 897 (Mo.App. 1996)).

In denying the State's request for a lower rate of return on equity because of UE's substandard service, the commission's decision said:

> Some parties suggest that having established what it believes to be a fair and reasonable rate, the Commission should reduce that rate to punish [UE] for what they believe was a poor performance during the severe storms of 2006 and 2007. The Commission will not do so in this case. The Commissioner's decision regarding the return on equity that [UE] will be allowed is based on the evidence presented in this case. Based on that evidence, the Commission concludes that [UE] is entitled to a below average return on equity compared to other vertically integrated utilities in the United States. No return on equity performance adjustment is necessary. The Commission will enforce service quality, reliability, and performance standards through pending rulemakings designed to establish expected perform-

ance levels for all Missouri's electric utilities.

The commission did not err in denying the State's request.

UE next complains that the commission erred by not making findings of fact concerning the rate of return on equity that satisfied the requirements of §§ 386.420 and 536.090, RSMo 2000. UE complains that the commission did not explain how it determined a rate of 10.2 percent. Public Counsel makes a similar argument.

■ Section 386.420.2 requires the commission to "make a report in writing in respect thereto, which shall state the conclusions of the commission, together with its decision, order or requirement in the premises." This requires the commission to avoid making findings of fact that are "'completely conclusory.'" *State ex rel. Laclede Gas Company v. Public Service Commission,* 103 S.W.3d 813, 816 (Mo. App.2003) (*quoting State ex rel. Monsanto v. Public Service Commission,* 716 S.W.2d 791, 795 (Mo. banc 1986)). Section 386.420 does not define what constitutes adequate findings of fact, but Missouri courts have filled this gap by applying § 536.090, RSMo 2000, from the state's administrative procedures statutes. The General Assembly declared in § 536.090 that the statute applies to "[e]very decision and order in a contested case," and the statute says:

> Every decision and order in a contested case shall be in writing, and except in default cases or cases disposed of by stipulation, consent order or agreed settlement, the decision, including orders refusing licenses, shall include or be accompanied by findings of fact and conclusions of law. The findings of fact shall be stated separately from the conclusions of law and shall include a concise statement of the findings on which the agency bases its order.

■ Whether or not the commission made adequate findings of fact is an issue of law for our independent judgment. *Laclede Gas,* 103 S.W.3d at 816. We use a flexible standard: The findings of fact must be " 'sufficiently definite and certain or specific under the circumstances of the particular case to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence.' " *Id. (quoting Glasnapp v. State Banking Board,* 545 S.W.2d 382, 387 (Mo. App.1976)). Findings are inadequate if they cause us to speculate as to which part of the evidence the commission believed. *Id.*

We had no difficulty understanding the basis for the commission's setting UE's rate of return at 10.2 percent. The commission provided much detail in explaining how it reached its conclusion. The appellants' contentions are without merit.

The State and Public Counsel next challenge the manner in which the commission factored UE's combustion turbine generators (CTGs) in Illinois into UE's revenue requirement. The commission valued the CTGs at the price that UE had paid for them during 2005.

■ The State and Public Counsel first claim that the commission improperly applied Regulation 4 CSR 240–20.015 by putting the burden of proof on the State to establish that UE paid too much for the CTGs. In assigning the burden of proof to the State and Public Counsel to establish that UE had paid too much for the CTGs, the commission's decision said:

> While [UE] has the overall burden of prov[ing] that the rates it is proposing are just and reasonable, a slightly different rule applies when a party alleges the utility has been imprudent in some manner. The party alleging imprudence has the burden of creating a serious doubt

as to the prudence of an expenditure. If that is accomplished, then the company has the burden of proving the expenditure was in fact prudent.

Although the State and Public Counsel concede that the commission stated the general rule accurately, they claim that Regulation 240–20.015(2) superseded the general rule. This regulation says:

> (A) A regulated electrical corporation shall not provide a financial advantage to an affiliated entity. For the purposes of this rule, a regulated electrical corporation shall be deemed to provide a financial advantage to an affiliated entity if—
>
> 1. It compensates an affiliated entity for goods or services above the lesser of—
>
> A. The fair market price; or
>
> B. The fully distributed cost to the regulated electrical corporation to provide the goods or services for itself[.]

As support for their claim, the State and Public Counsel point to the language of Regulation 240–20.015(3), which requires the utility to demonstrate that it considered all of the cost of the transaction with its affiliate:

> (A) When a regulated electrical corporation purchases ... assets ... from an affiliated entity, the regulated electrical corporation shall either obtain competitive bids for such ... assets ... or *demonstrate* why competitive bids were neither necessary nor appropriate.
>
> (B) In transactions that involve either the purchase or receipt of ... assets ... by a regulated electrical corporation from an affiliated entity, the regulated electrical corporation shall document both the fair market price of such ... assets ... and the FDC to the regulated

electrical corporation to produce the ... assets ... for itself.

(C) In transactions that involve the provision of ... assets ... to affiliated entities, the regulated electrical corporation must *demonstrate* that it—

1. Considered all costs incurred to complete the transaction;

2. Calculated the costs at times relevant to the transaction;

3. Allocated all joint and common costs appropriately; and

4. Adequately determined the fair market price of the information, assets, goods or services.[3]

The State and Public Counsel assert that this regulation placed the initial burden on UE to demonstrate that it had paid its affiliates fair market value for the CTGs.

Their assertion is incorrect. Regulation 240–20.015(6)(c) says, "This rule does not modify existing legal standards regarding which party has the burden of proof in the commission proceeding." This means that the regulation does not modify the existing burden of proof. Although UE purchased the CTGs from its affiliates, the commission properly presumed that UE was prudent in its purchase of the CTGs, until the State or Public Counsel presented evidence that raised a "serious doubt" concerning the prudence of its expenditure. *State ex rel. Associated Natural Gas Company v. Public Service Commission of the State of Missouri*, 954 S.W.2d 520, 528 (Mo.App.1997).

■■■ The State and Public Counsel argue that, even if the commission did not misapply the law, it erred in setting the CTGs' value. The commission valued UE's Pinckneyville CTG at $161 million or $511 per kilowatt and UE's Kimmundy CTG at $96.4 million or $439.50 per kilo-

watt. The commission concluded that these were appropriate values primarily because they were the amounts that UE had paid for them during 2005.

Public Counsel contends that he carried his burden of raising "serious doubts" about UE's expenditure by presenting undisputed evidence that UE had purchased similar CTGs for an average price of $193.80 per kilowatt. He also asserts that he presented undisputed evidence that, during 2002, UE had considered purchasing a plant similar to the Pinckneyville and Kimmundy plants for $312.50 per kilowatt. Public Counsel argues that either of those figures—$193.80 per kilowatt or $312.50 per kilowatt—was a better indicator of the CTGs' fair market value and established that UE paid more than fair market value for the CTGs.

The commission explained why it found that Public Counsel did not raise serious doubts about UE's purchase of the CTGs from its affiliates:

The State and Public Counsel base their allegations of imprudence on their measurements of the market value of CTGs at the time they were purchased. They allege that the market for such units was depressed at the time of the purchase and that [UE] overpaid for the units simply to bail out its affiliate. However, the evidence they garner to support that allegation is very thin.

Public Counsel recommends the Commission use the blended price per kW [UE] recently paid for CTG facilities at Audrain, Goose Creek and Raccoon Creek as the presumptive market price for the Pinckneyville and Kinmundy units. It claims the blended cost of those other CTGs was $193.80 per kW. As a secondary recommendation, Public Counsel recommends using a price of

---

3. We added the emphasis.

$312.50 per kW for which the Audrian plant was reputedly offered to [UE] in 2002.

[UE] did recently purchase CTG facilities at Audrian, Goose Creek and Raccoon Creek, but for various reasons their purchase price is not a good measure of the market price for Pinckneyville and Kinmundy. First, the Audrian plant includes eight large frame unit with a summer peak rating of 75 mW. The Goose Creek facility has six large frame CTGs with a total summer capability rating of 432 mW. The Raccoon Creek facility is comprised of four large frame CTGs with a total net summer capability rating of 300 mW. The Kinnundy plant can burn either oil or natural gas. Audrain, as well was Goose Creek and Raccoon Creek, are limited to natural gas. The Pinckneyville units have a lower heat rate constituting a significant improvement in efficiency. All of these factors indicate the Pinckney and Kinmundy units have a higher market value than the Audrain plant or Goose Creek and Raccoon Creek.

More significantly, [UE] was able to purchase those three facilit[ies] in what was essentially a forced sale. NRG Energy, Inc., the owner of the Audrain Plant, was in bankruptcy at the time the plant was sold. ... The purchase of the Goose Creek and Raccoon Creek plants from Aquila occurred in similar circumstances. At the time of the sale, Aquila was anxious to sell off assets to improve its financial situation.[4]

The commission did not err in making these findings of fact. Public Counsel concedes that the record establishes that major factors distinguished UE's purchase of CTGs in Illinois from its earlier CTG purchases. These differences provided a reasonable basis for concluding that the earlier purchases were not a good indicator of the value of the Illinois CTGs. The commission concluded correctly that Public Counsel did not carry his burden of raising serious doubts regarding UE's expenditures.

The State, however, claims that it carried its burden of raising serious doubts about UE's expenditure because its expert, Michael Brosch, a utility consultant, provided undisputed evidence that the average market price for comparable transactions was $288 per kilowatt. Brosch's testimony was undisputed, but the commission declared that it did not believe his testimony:

> ... Brosch acknowledges that the sale that he is using for comparison includes a wide variety of types of CTG units; some are large frame and some are small frame. He did not know whether any of the CTG units that were sold had transmission constraint problems. He also did not know whether the units he was comparing to the Pinckeyville and Kinmundy plants were of the same general size and type as those units.

Brosch's inability to provide more details about his evaluation is not surprising because the information upon which he relied to make his evaluation is simply a compilation of magazine articles. The data he relied upon does not contain any information about the rating of the plants that were sold. It does not provide any specific non-public information about the transaction that could affect the valuation of the purchase. It does not provide any details of the fuel type used by the CTG, or their cycling capability. Because of the lack of detail in his study, Brosch's prices comparison cannot provide a reasonable basis for

4. We omitted the footnotes.

establishing the market value for the Pinckneyville and Kinmundy CTGs.[5] The commission, as the trier of fact, was free to disbelieve Brosch's testimony. *Associated Natural Gas Company,* 37 S.W.3d at 294. On appeal, the State concedes that the fallacies noted by the commission were legitimate.

■ Public Counsel joins the State in asserting next that the commission erred in not reducing UE's revenue requirement by approximately $70 million. The State contends that the commission should have made this adjustment to account for its loss of low cost electricity from Electric Energy's Joppa plant. They contend that the commission should have treated the Joppa plant as UE's regulatory asset. The State argues that, if the Joppa plant were UE's regulatory asset, its income should be imputed to UE because UE's ratepayers financed its construction and maintenance.

According to the evidence, UE and four independent utilities formed Electric Energy, Inc., during the 1950s to build a power plant near Joppa, Illinois, to generate electricity to sell to the federal government. Electric Energy financed construction primarily with debt and very little equity from the sponsoring utilities. Because of this financing, lenders required the utilities to agree to purchase Electric Energy electricity if the federal government terminated its program for which it was buying the electricity. UE and the utilities accepted these terms.

After UE renewed its last contract with Electric Energy during 1987, a market for wholesale electricity emerged, and Electric Energy made more selling its electricity in that market. The parties, therefore, did not renew their contract when it expired during 2005. Electric Energy's income increased substantially, and its shareholders reaped that benefit. UE owned 40 percent of Electric Energy's stock, and UE's parent company, Ameren, also owned 40 percent. Kentucky Utilities owned the remaining 20 percent. UE replaced the electricity that it had purchased from Electric Energy with more expensive electricity produced by its own CTGs.

In arguing for reducing UE's revenue requirement because of the loss of low cost electricity, the State concluded that the reduction should be $70 million because that was 40 percent—the amount of UE's share of Electric Energy's stock—of the difference between Electric Energy's 2006 profits and 2005 profits. The State contended that UE's financing the Joppa plant's construction and maintenance at the expense of UE's ratepayers justified the adjustment. Because UE's ratepayers had covered the risk of the Joppa plant, Brosch recommended that, in the interest of equity and fairness, the commission should impute Electric Energy's windfall profits:

> [R]atepayers who shouldered the costs and risks associated with the UE share of Joppa for many prior decades through rates should not be denied continuing participation in the current market value of energy output of the Station. ... Notably, the ratemaking adjustment I propose does not require the Commission to compel any extension of the expired Power Supply Agreement, but rather would impute the windfall profits now being recorded by the [UE] subsidiary resulting from such termination into the ratemaking calculations of [UE] as a revenue credit.

The commission rejected this argument:

> The only money [Electric Energy,] Inc., has received, even indirectly from

---

5. We omitted the footnotes.

[UE]'s ratepayers was for power under terms of the various power supply agreements in effect since the 1950s. The energy that [Electric Energy,] Inc., provided to [UE] was full consideration for the money it received under the contract. The purchase of power does not give the purchaser an ownership interest in the supplier of power any more than the purchase of a new car gives the purchaser an ownership interest in Ford Motor Company.

The other leg of this theory ignores that the guaranty given by Union Electric ... was the guaranty of the company, not the guaranty of its ratepayers. Because [Electric Energy,] Inc., paid off its debts on its own no one can ever know for sure what might have happened if [UE] had been required to pay the debts of [Electric Energy,] Inc. But it is inconceivable that this Commission would, at any time in its history, have allowed a utility to include the cost of guarantying the debt of an unregulated affiliate in its rates and thereby pass those costs on to its ratepayers. It is equally inconceivable that this Commission would require ratepayers to pay for purchased power that was not actually delivered. If any such cost had ever been incurred, they would have been the responsibility of the company and its shareholders. Therefore, [UE] and its shareholders bore any risk associated with [UE]'s ownership of the stock of [Energy Electric,] Inc. [UE]'s ratepayers merely paid to purchase low cost power from [Energy Electric,] Inc.'s Joppa plant and did not acquire any ownership interest in [Energy Electric,] Inc., by doing so.[6]

The State argues that, although the commission made these findings of fact, the findings did not address its argument because its imputation argument did not require or assume that UE or its ratepayers gained an equitable interest in the Joppa plant. The State is wrong. Although, the commission entitled the State's argument an "equitable ownership theory," a term that the State argues does not accurately describe its argument, the commission clearly equated its equitable ownership theory with the State's imputation theory. In fact, the commission articulates the State's entire point.

The State next argues that, to the extent that the commission's findings of fact did address its point, the record did not support the findings. Again, the State is wrong. The State's main witness, Brosch, admitted that his entire justification for imputing the income of the Joppa plant to UE would disappear if UE's shareholders bore the risk of the Joppa plant:

> [In the absence of] a showing by the Company that its shareholders have borne significant risks and costs arising from such operations outside of regulations, there is no basis today to treat [UE]'s 40 percent share of [Electric Energy,] Inc., and the corresponding market value and income stream, as anything but a regulatory asset.

Substantial evidence established that UE's shareholders, and not its ratepayers, bore the entire risk of constructing and operating the Joppa plant. Michael Moehn, vice-present of UE's parent company, Ameren, testified that UE purchased Electric Energy's stock using shareholder funds and that UE never included the Joppa power plant in its rate base; therefore, UE could not pass along the Joppa plant's cost to its ratepayers. Indeed, Moehn testified to specific instances in which UE's shareholders, and not its ratepayers, absorbed losses because of the Joppa plant. He said

6. We omitted the footnotes.

that, when Electric Energy lost money after abandoning a project to construct a coal transfer terminal, UE did not include those losses in its rate base or pass them to its ratepayers. Rather, UE's shareholders absorbed the losses. Hence, the entire assumption underlying Brosch's and the State's imputation theory was wrong.

■ Public Counsel, on the other hand, argues that the commission erred in not imputing this lost revenue because the record established that UE acted imprudently when it failed to renew purchase contracts with Electric Energy. Public Counsel claims that UE acted imprudently in not combining its 40 percent share of Electric Energy's stock with Ameren's or Kentucky Utility's stock to force the Electric Energy board to continue selling electricity to UE at cost.

■ In evaluating the prudence of a utility's action, the utility enjoys a presumption that it acted prudently until a party presents evidence that raises a serious doubt with the expenditure. *Associated Natural Gas Company,* 954 S.W.2d at 528. In finding that UE did not act imprudently concerning Electric Energy, the commission concluded:

> Fundamentally ..., the argument that [UE] should have taken steps to force [Electric Energy,] Inc., to continue to sell its power at cost-based rates is based on the premise that [UE] had an obligation to forego shareholder profits from an unregulated affiliate to benefit ratepayers. Certainly, as a regulated utility, [UE] has an obligation to obtain its power supply at the lowest prudent cost. It did that by buying low cost power from [Electric Energy,] Inc., for 50 years, to the benefit of ratepayers. [UE] also has an obligation to engage in fair dealing with an affiliated company, and the Commission's affiliate transaction rule prohibits an action to benefit

an affiliate to the detriment of its ratepayers. But, contrary to the heated rhetoric of some parties, [UE] did not conspire to remove [Electric Energy,] Inc., from regulation; [Energy Electric,] Inc., was never subject to regulation by this Commission and [UE]'s Missouri ratepayers have no ownership interest in [Electric Energy,] Inc., or the power produced by the Joppa plant.

. . . .

> [Electric Energy,] Inc., made a rational business decision to stop selling cost-based power to [UE] and to instead seek much greater profits by selling power on the newly available market. As an entity subject to regulation by the FERC, and not by the Commission, [Energy Electric,] Inc., had every right to make that decision. [UE] had no power, and no obligation to change [Energy Electric,] Inc.'s decision. [UE] has not acted imprudently. No reduction in revenue requirement is warranted.

We agree with the commission. Forcing Electric Energy's board to lose out on profits by selling its electricity to UE at cost instead of selling it on the open market likely would have resulted in the board's violating its fiduciary duty under Illinois law to manage the corporate business solely in accord with the corporation's interest. *IOS Capital, Inc. v. Phoenix Printing, Inc.,* 348 Ill.App.3d 366, 283 Ill. Dec. 640, 808 N.E.2d 606, 612 (Ill.App.Ct. 2004). Public Counsel cites no cases holding that a utility acts imprudently when it fails to require its affiliate to violate its fiduciary duty so the utility's ratepayers can pay a lower rate, and considering UE imprudent for failing to take an action that could open up its affiliate to liability makes little sense. The commission did not err in failing to impute this income into UE's revenue requirement.

■ The State finally asserts that the commission erred in not reducing UE's revenue requirement to account for UE's losses resulting from destruction of its Taum Sauk Plant. The State claims that UE's revenue requirement is high because UE is no longer able to make any money off capacity sales from the plant. The State contends that, because undisputed evidence established that UE's negligence caused the plant's destruction, the commission should have adjusted UE's revenue requirement so ratepayers are not paying higher rates caused by UE's negligence. Public Counsel makes a similar argument.

The commission responds that the record establishes that it refused to address the issue because neither party raised it until after the evidentiary hearing. The commission declared:

Public Counsel has attempted to raise one additional issue. In the Revised True–Up Reconciliation filed on April 19, 2007, Public Counsel for the first time proposed a $10,320,000 reduction to [UE]'s revenue requirement for what Public Counsel called "Taum Sauk Hold Harmless—Capacity Sale.["]

. . . .

[UE] contends Public Counsel's newly proposed adjustment is far out-of-time and violates the Commission's rule and its procedural order for this case. The Commission agrees.

. . . .

At this point, very late in this proceeding, it is far too late for the Commission to gather the evidence needed to make any findings of fact or conclusions of law regarding these questions. If Public Counsel had actually raised this issue at the hearing when it says it first became aware of the issue, the Commission might have been willing to allow Public Counsel, [UE], and the other parties a reasonable opportunity to present

additional evidence on that question, as indicated in the Commission's procedural rule. It might even have been possible to schedule an additional day of hearings to consider that issue. But instead, Public Counsel waited until it filed its brief, over 20 days after hearing ended and the evidentiary record closed, to spring this issue on the Commission and the other parties.

. . . .

The commission cannot just assume that evidence into existence without giving [UE] and the other parties an opportunity to rebut that evidence.

The commission never ruled on the merits of the issue. Hence, the only issue for us to consider is whether or not the commission was correct that Public Counsel failed to raise the issue in a timely fashion.

Pursuant to § 386.410, RSMo 2000, the General Assembly has authorized the commission to promulgate rules governing its hearings. The commission adopted Regulation 4 CSR 240–2.110(3), which says, "When pending actions involve related questions of law or fact, the commission may order a joint hearing of any or all the matters at issue, and may make other orders concerning cases before it to avoid unnecessary costs or delay." From this rule, the commission adopted its order of September 22, 2006, in which it prohibited the parties from raising arguments that were not on its issues list. The order said:

The parties shall agree upon and Staff shall file a list of the issues to be heard, the witnesses to appear on each day of the hearing, the order in which they will be called, and the order of cross-examination for each witness. Any issue not contained in this list of issues will be viewed as uncontested and not requiring resolution by the Commission.

This order was a reasonable exercise of the commission's power and undoubtedly furthered the goal articulated in Regulation 240–2.110(3) of avoiding unnecessary delay. Neither Public Counsel nor the State contends that the commission lacked the authority to execute its order, and they concede that this issue was not on the "issue list" and that Public Counsel waited until the hearing had ended before raising it. The commission did not err in concluding that its order of September 22, 2006, prohibited it from addressing the issue.

Nevertheless, Public Counsel and the State claim that their failure to raise the issue in a timely fashion should not matter because the record contained sufficient evidence for the commission to decide the issue. Public Counsel and the State, however, apparently miss the point of the commission's order: to force the parties to outline the issues in advance so all parties would have time to file testimony to rebut their opponent's positions. Hence, even if the record does contain sufficient evidence, UE did not have an opportunity to present rebuttal testimony on the issue. The commission did not err in refusing to consider the issue.

Public Counsel next asserts that the commission erred in denying his motion to dismiss UE's rate case on the ground that UE had failed to appear at three public hearings. Public Counsel contends that the commission misapplied Regulation 4 CSR 240–2.116(3) in denying his motion to dismiss. Regulation 240–2.116(3) says, "A party may be dismissed from a case for failure to comply with any order issued by the commission, including failure to appear at any scheduled proceeding such as a public hearing, prehearing conference, hearing, or mediation session." Public Counsel complains that the commission misapplied the regulation by finding that UE satisfied its obligation to appear at the

public hearings by sending its employees as its representatives. Public Counsel asserts that, under the regulation, only an attorney could appear at the public hearings as UE's representative.

The commission, however, did not deny Public Counsel's motion because UE had fulfilled its obligation under the regulation. Rather, it denied the motion because the commission never executed an order that required UE to appear at the public hearings. The commission said:

> The rule ... gives the Commission discretion to dismiss a party from a case for failing to comply with a Commission order to appear at a local public hearing, or other scheduled proceeding. The Commission's order to appear scheduling fifteen local public hearings regarding [UE]'s request for a rate increase was issued on November 3, 2006. A sixteen[th] local public hearing was subsequently scheduled in an order issued on January 5. Neither order explicitly requires counsel representing any party to appear at any local public hearing. Therefore, Public Counsel cannot point to any Commission order [UE] has violated.

The commission interpreted Regulation 4 CSR 240–2.116(3) correctly. The regulation says "[a] party may be dismissed from a case for failure to comply with any order." By its express language, to dismiss a party from a case, the party must violate one of the commission's orders. Public Counsel does not point to an order by the commission requiring UE to appear—by attorney or employee—at the public hearings.

Furthermore, the use of the term "may" in the regulation indicates that the commission has the discretion to determine whether or not it should dismiss a party from the proceedings. *Estate of Parker*, 25 S.W.3d at 616. Hence, even if the commission had ordered UE to send its

attorneys to the hearings to appear on its behalf and UE violated the order, the commission had the discretion not to dismiss UE's rate case. The commission did not err in denying Public Counsel's motion to dismiss.

Public Counsel next asserts that the commission erred in adjusting UE's revenue requirement downward by only $230 million to account for the profits it receives from off-system sales. He contends that the record establishes that the commission relied on an incorrect methodology in calculating the reduction. He avers that the commission erred in relying on its staff's computer model, which determined the amount of UE's off-system sales. He argues that the commission should have relied on his expert's model, which established that UE's off-system sales were substantially higher.

■ Well-established law grants the commission considerable discretion in rate setting because of the inherent complexities involved in the process. *State ex rel. Office of the Public Counsel v. Public Service Commission*, 938 S.W.2d 339, 344 (Mo.App.1997). This discretion extends to the commission's use of one method over another to set rates. *Id.*

The evidence at the hearing established that UE sells most of its electricity to regional customers. It sells electricity that these customers do not use to off-system buyers, like other utilities, municipalities, or cooperatives. All parties agreed that, because plants funded by UE's ratepayers generate this electricity, the profits from off-system sales should reduce UE's revenue requirement. The parties disagreed only on the proper meth-od for calculating the amount of off-system sales.

The commission's staff used production cost models to simulate UE's profits from off-system sales. These models predicted that UE's profits from off-system sales would be $230 million. Public Counsel argues that, rather than relying on these models, the commission should set the off-system profits at the amount that UE included in its 2007 budget for off-system sales.[7] In rejecting Public Counsel's proposed method and amount, the commission found:

It is tempting to use [UE]'s budgeted amount for off-system sales as the base line. The person in charge of [UE]'s budget, its Chief Financial Officer, Warner Baxter, testified that [UE]'s budget assumptions are expected to be reasonable and achievable. If [UE] believes that it can attain the budgeted amount for off-system sales, why should it not be held to its own goal?

There are, however, a couple of flaws in that approach. First, the 2007 budgeted amount is not normalized to account for planned generation outages. If fewer than normal outages are planned for 2007, as [UE] suggests, then the budget amount would not be indicative of the reasonably anticipated level of off-system sales that could be expected in a normal year. For that reason, the production models used by Staff and [UE] to predict a level of off-system sales may be more reliable going forward.

The second problem with using the 2007 budgeted amount to set a level for off-system sales is more fundamental. In Missouri, rates are set using a historical test year. The Commission exam-

---

**7.** Because of confidentiality concerns, the commission did not include this amount in its order. On appeal, all parties agree that the amount is substantially higher than $230 million.

ines the utility's revenues and expenses for that test year and uses that information to set rates to be charged in the future. The Commission does not use a forward-looking test year based on budgets and projections to set those rates. If it did, [UE] would no doubt appreciate an opportunity to base its rates on what it believes will be higher fuel costs in the coming years. Since the Commission uses historical expenses and revenues to set rates, it would be fundamentally unfair to reach forward to grab a single budget item to reduce [UE]'s cost of service, while ignoring other anticipated costs that might increase that cost of service.[8]

The commission has much discretion in determining the theory or method it uses to determine rates. *Id.* Hence, even if Public Counsel presented a valid method for calculating off-systems sales, the commission was free to choose its staff's method over Public Counsel's method. We do not discern that the commission abused its discretion.

As the commission noted, it typically sets a historical test year and uses a utility's revenue and expenses from that year to set rates for the future. *State ex rel. Southwestern Bell Telephone Co. v. Public Service Commission,* 645 S.W.2d 44, 53 (Mo.App.1982). The commission finding that its staff's production cost models were consistent with its overall test year methodology was reasonable. Also reasonable was the commission's finding that using budget projections for one figure would be fundamentally unfair to UE. The commission did not err in using only historical figures; hence, it was correct that Public Counsel's budget method was flawed.

In his next point, Public Counsel contends that the commission erred in entering UE's Peno Creek plant into its rate base at a value of $550 per kilowatt. He complains that the record established that UE paid more than fair market value to construct the plant because UE unduly delayed its construction.

■ In ratemaking cases, a utility receives the benefit of a presumption of prudence with regard to its costs until another party raises a serious doubt regarding the prudence of its expenditure. *Associated Natural Gas Company,* 954 S.W.2d at 528. When another party raises a serious doubt regarding an expenditure, the burden shifts to the utility to prove the prudence of the expenditure. *Id.*

UE claimed that the cost of the Peno Creek plant was $550 per kilowatt. Leon Bender, a commission staff member, testified that he monitored the plant's construction and had no concerns with its cost. He recommended adding all of Peno Creek's construction cost into UE's rate base.

Public Counsel countered this testimony with the testimony of Ryan Kind, Public Counsel's chief economist. Kind recommended that Peno Creek's cost be reduced from $550 per kilowatt to $390 per kilowatt. He opined that Peno Creek's original construction cost was inflated because UE delayed construction to attempt to convince legislators to enact a regulatory restructuring law. Had the General Assembly enacted the law, UE would have been able to gain capacity from an affiliated non-regulated generation company and would not have needed to build a new plant. When the General Assembly failed to pass the bill, UE needed to find another source of electricity and had to expedite Peno Creek's construction. Kind alleged that the expedited schedule increased construction cost. Based on Kind's testimony,

8. We omitted the footnotes.

Public Counsel argued that the commission should reduce Peno Creek's cost to $390 per kilowatt.

In denying Public Counsel's request, the commission found:

Staff's engineer, who actually inspected the plant and audited its construction, testified that the full cost of the construction should be included in rate base. Against these facts, Public Counsel offers only speculations about increased costs, offered by a witness who is an economist, not an engineer, and who has no particular expertise in the design of UE's generation fleet.

. . . .

Mere speculation about political motivations and possibly increased prices does not create a serious doubt about the prudence of UE's expenditures on the Peno Creek CTG facility.

The commission obviously decided to accept UE's valuation of its Peno Creek plant because it believed that Bender was the more credible witness. Bender's testimony provided the commission with an adequate basis for believing that all of Peno Creek's cost should be included in UE's rate base. Hence, Public Counsel did not carry his burden of establishing that the commission should have "serious doubts" about Peno Creek's construction cost.

Public Counsel concedes that the commission's findings adequately reflected Bender's testimony. He claims only that the commission should have believed his expert witness rather than Bender. As the trier of fact, however, the commission was free to believe Bender rather than Kind. *Associated Natural Gas Company*, 37 S.W.3d at 294.

Public Counsel finally asserts that the commission erred in lowering UE's revenue requirement by $5 million to account for the profits that UE makes on the sale of its extra sulfur dioxide ($SO_2$) allowances because the record does not support that figure.

As part of the Clean Air Act, the United States Environmental Protection Agency authorizes utilities' $SO_2$ emission allowances. 42 U.S.C. § 7651b(a)(1). A utility not using all of its $SO_2$ allowances may sell them to another utility. 42 U.S.C. § 7651b(b). The parties agreed that UE usually burns low sulfur coal and, therefore, tends to have a surplus of $SO_2$ allowances, which it sells. The parties agreed that UE's income from these permits should offset UE's cost of service. The parties disagreed on how to calculate the amount of income that UE makes from $SO_2$ allowances sales.

Public Counsel recommended reducing UE's revenue requirement by nearly $24 million a year to account for its sale of $SO_2$ allowance. Public Counsel asserts that this is the normalized figure for the last five years of UE's $SO_2$ allowance sales. Averaging four years of sales, the State calculated UE's $SO_2$ allowances sales to be $20.3 million. The commission's staff and UE argued that UE's $SO_2$ allowance sales should offset operating and maintenance expenses that UE incurred in the extreme storms of 2006. The staff and UE proposed that $SO_2$ allowances sales be tracked in a regulatory liability account that should reduce UE's revenue requirement at its next rate case.

In its conclusions, the commission established a regulatory tracking system and established the annual baseline of UE's $SO_2$ allowance sales at $5 million:

The Commission will establish an accounting mechanism to track [UE]'s future $SO_2$ sales. Beginning on January 1, 2007, all $SO_2$ premiums, net of $SO_2$ discounts, shall be accounted for in FERC USOA Account 254, a regulatory liability

account. All gains associated with $SO_2$ allowance sales, beginning on January 1, 2007, shall also be recorded in the same regulatory liability account. The net balance of $SO_2$ premium expenses (or discounts) and corresponding gains associated with $SO_2$ allowance sales shall be addressed as part of the fuel expense calculation in [UE]'s next rate proceeding. The question remains of whether a base amount of $SO_2$ sales should be included in that tracking mechanism.

. . . .

The Commission wants to encourage [UE] to manage its balance of $SO_2$ allowances wisely and does not want to effectively force it to meet an annual quota of sales to earn its allowed rate of return. Therefore, the Commission will establish the annual base level of $SO_2$ sales as $5 million, which is approximately one fourth of the four-year average calculated by the State's witness.

Public Counsel does not argue that the commission erred in creating a tracking system to monitor UE's $SO_2$ allowance sales so it could adjust its future revenue requirements. Rather, Public Counsel claims that the commission should not have used the baseline figure of $5 million because figuring out how the commission arrived at that figure is impossible. We disagree.

The commission's baseline of $5 million was well within the figures adduced at the hearing—a range from zero to $24 million. We, therefore, will not substitute our discretion for the commission's discretion. *See Redel v. Capital Region Medical Center,* 165 S.W.3d 168, 178 (Mo.App.2005). Furthermore, the commission explained that it adopted this figure as a baseline because it wanted to encourage UE to manage its $SO_2$ allowances wisely and did not want UE to feel forced into meeting an annual quota to earn its rate of return.

Public Counsel concedes that this is a valid concern and makes no argument that the commission's baseline of $5 million would fail to accomplish this goal. The commission, therefore, did not err in setting UE's baseline of $SO_2$ allowances at $5 million.

The commission's order authorizing UE to increase its revenue by $43 million is affirmed.

HAROLD L. LOWENSTEIN, Presiding Judge, and VICTOR C. HOWARD, Judge, concur.